IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DISGUISE SYSTEMS LIMITED, a United Kingdom company; DISGUISE TECHNOLOGIES LMITED, a United Kingdom company; and DOES 1-50, inclusive, <br><br> *Plaintiffs,* <br><br> v. <br><br> ONE STOP SYSTEMS, INC., a Delaware corporation, <br><br> *Defendant.* | ) ) ) ) ) Civil Action No. ) ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) |

## COMPLAINT

Plaintiffs, Disguise Systems Limited ("Disguise Systems"), a United Kingdom company and Disguise Technologies Limited ("Disguise Tech.") (collectively, "Disguise" or "Plaintiff"), a United Kingdom company sues Defendant, One Stop Systems, Inc. ("OSS") (collectively, the "Parties"), a Delaware corporation and alleges:

## NATURE OF THE CASE

1. On or about July 1, 2019, the Parties entered into the arms-length Equipment Manufacturing and Supply Agreement (the "Agreement"), which was intended to last five years. OSS manufactured products for Disguise. Those products were to be sold in the Americas, Japan, and Korea. OSS took advantage of Disguise's reliance on it by unilaterally demanding ever increasing hikes in labor costs on the threat of serious financial losses to Disguise associated with OSS failing to perform its contractual obligations.

2. Near the end of 2022, Disguise notified OSS that it would be launching a new product range with a new manufacturing partner, with the labor costs demanded by OSS far exceeding the rates mutually agreed upon in the Agreement playing a key part in this decision. OSS responded by stopping shipment on new products and stopping shipment on in-warranty

repaired or replaced products owned by Disguise's customers, to force Disguise into accepting six extra-contractual conditions, including the payment of more than a million dollars in inventory fees for alleged sums OSS incurred for materials 'forward purchased' despite Disguise not submitting purchase orders or agreeing to such forward purchasing in writing or otherwise. The Agreement does not provide for such a process or payment.

3. At the same time, OSS' work quality was poor. About one third of the products inspected by Disguise in 2023 were defective. Defendant OSS' shoddy work product resulted in Disguise incurring damages in connection with repairing or replacing the products because OSS was refusing to honor the Agreement.

4. Based on the forgoing, Disguise brings this action seeking declaratory relief and damages resulting from breaches of contract and intentional torts. Further, Disguise seeks punitive damages.

## THE PARTIES

5. Plaintiff Disguise Systems is a United Kingdom company with its principal place of business in London, United Kingdom.

6. Plaintiff Disguise Tech. is also a United Kingdom company with its principal place of business in London, United Kingdom.

7. Defendant OSS is a Delaware corporation with its principal place of business in Escondido, California.

8. Upon information and belief, additional parties fictitiously named herein as DOES 1-50, inclusive, actively participated in and materially contributed to the acts and/or omissions alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of these other parties are currently unknown to Disguise. Once Disguise learns of the identities of these other parties through discovery and/or other means, Disguise will amend this complaint to state such parties true names and capacities.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

10. First, the Parties have diverse citizenship. Disguise are United Kingdom companies with principal places of business in the United Kingdom. OSS is a Delaware corporation with its principal place of business in California.

11. Second, the amount in controversy exceeds $75,000.00. As explained below, due to OSS' intentional and tortious conduct, Disguise suffered damages in excess of several million dollars.

12. This Court has the power to declare the parties' rights and obligations pursuant 28 U.S.C. § 2201.

13. Venue is proper because OSS is a resident of the State of Delaware in which this Court resides. *See* 28 U.S. Code § 1391(b)(1) ("A civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located.").

**EQUIPMENT MANUFACTURING AND SUPPLY AGREEMENT**

14. On or about July 1, 2019, the Parties entered into the arms-length Equipment Manufacturing and Supply Agreement (the "Agreement"). The Agreement is incorporated by reference and affixed as Exhibit 1. The Agreement was intended to expire on the fifth anniversary of the effective date of the Agreement (July 1, 2024), unless the Parties negotiated an extension of the Agreement.

15. OSS covenanted that it would manufacture and supply Disguise with production-released products intended to be sold directly to customers. The products are servers.

16. Disguise System intended to distribute the products supplied by OSS in connection with the Agreement.

17. Pursuant to the Agreement, OSS was the exclusive manufacturer for products that Disguise distributed in North, Central, and South America. The Parties also agreed that OSS would

be Disguise's exclusive manufacturer for products distributed in Japan and Korea until Disguise secured a manufacturer for the products located in Asia.

18. OSS agreed that its exclusivity rights hinged on it being able to manufacture and supply the products below the selling, general, and administrative expenses ("SG&A") and profit rates outlined in Exhibit B of the Agreement. OSS also understood, and the Agreement reflects, that shoddy workmanship would be unacceptable.

19. OSS further covenanted that it would "procure, manufacture and ship pursuant to Purchase Orders issued by the Buyer" and that although Disguise would provide a minimum of a six month rolling forecast at the end of each month, "such forecasts shall not be binding on Buyer", as stated in Exhibit C of the Agreement.

20. OSS warrantied that the products produced in connection with the Agreement would "be free from all liens and encumbrances (including free from any claim that such Product infringes any third party's intellectual property rights), defects in material, workmanship and design and will function in accordance with and will conform to the Specifications for a period of two (2) years from shipment of such Product manufactured at Suppliers authorized facilities to the Buyer ('Warranty Period')."

21. If any product required any in-warranty repairs or replacement, OSS promised that it would repair or replace the product within 15 days of receiving the product.

22. The Parties also agreed that if any dispute were to arise amongst the Parties under the Agreement, the dispute would be governed by California law.

### **OSS' EXTORTION OF DISGUISE**

23. OSS started disregarding the Agreement's requirements by unilaterally forcing cost increases onto Disguise in March 2021. OSS' agent, David Raun ("Raun"), demanded that OSS' labor hours to build the servers increase by 25% (8 hours to 10 hours) per forecasted item.

24. Due to a lack of alternative options and the adverse impact a sudden halt in production would have, Disguise was forced to agree under duress to the increase demanded by Raun.

25. Before the execution of the Agreement, OSS and Disguise had worked together under an arrangement similar to that of the Agreement for approximately five years. Those past experiences informed the terms of the Agreement, including estimates surrounding the costs of labor and the time needed for manufacturing hours. OSS' demand to increase labor costs and hours, therefore, was surprising and in conflict with the terms of the Agreement as outlined in Exhibit B of the Agreement, and contrary to Disguise's expectations. OSS also knew that Disguise lacked alternative options for the manufacture of its products, and Disguise would suffer significant financial losses if it did not consent to OSS' demands.

26. Then, on or about March 28, 2022, OSS' Raun again demanded price increases for OSS. He demanded that the hourly labor cost increase from $125 to $205 (an increase of $80 per hour) and the labor hours increase another 2 hours on top of the previous 2 hours, taking it from 10 hours to 12 hours, a fifty percent increase over the 8 hours in the Agreement.. He further demanded that the increases would be retroactive to January 2022. Raun attempted to justify near doubling of labor costs on the grounds that OSS was no longer able to bear "absorb[ing] the delta between the 10 hours and actual of 22+ for years now which has been very costly to the company." Never in the many years that OSS and Disguise worked together had OSS ever mentioned the existence of such a delta, nor was this ever mentioned during the negotiation of the parties' agreements. In further conflict with that statement, the Agreement specifically contemplates profit rates for OSS.

27. Raun ended his demand saying:

> At my earnings call, I did everything I could do to paint a positive picture, but my low gross margin and unexpected net income loss was not received well and it pushed our stock down. It would have been worse but I decided to share with the market our early success in a very large market that could pay off nicely in future years. I really did not want to share it for another six months for competitive reasons plus I wanted to verify it a little more, but I had to do something to prevent us from a freefall. Unfortunately this combined with a record year on many fronts, did not offset the message on the low margins and resulting loss. I had to commit to margins coming back up for the current march ending quarter.

28. In other words, Raun admitted OSS was struggling financially and was seeking to improve its bottom line by taking advantage of Disguise because he knew Disguise lacked alternative manufacturing options without incurring significant damages.

29. Raun added further context to OSS' demand the following day. He explained, in an email, that OSS' first quarter of the year was ending later in the week. Any change to an agreement or new agreement between OSS and Disguise would be reflected in the first quarter report. To that end, he said it would be "a good situation for OSS or me personally as [Disguise's] partner" if Disguise were to come to a quick arrangement with OSS. Raun concluded that he would like to discuss OSS' demand further over video or in-person because "[e]mails are dangerous and do not seem to progress the matter."

30. Raun flew to London the next day. After further negotiations, the Parties agreed to increase the costs from $125 per hour labor to $135 per hour labor, and increase production time from 10 hours labor to 12 hours labor for each server, and have the changes be retroactive to January 2022. These increases took the labor costs from $1,000 per server, as per the Agreement, to $1,620 per server, in complete contradiction to Exhibit B, which states: *'Buyer and Supplier will work together in good faith to reduce labor hours to lower future costs'*. Disguise only agreed to OSS' bad faith demands for the amendment because, if Disguise refused, OSS would have halted its manufacturing obligations leaving Disguise without any ability to conduct business without suffering a potentially catastrophic economic loss.

31. Due to a lack of alternative options and the adverse impact a sudden halt in production would have, Disguise was forced to tentatively agree under duress to the increase on the condition that the increases be temporary and be renegotiated in May 2022.

32. OSS refused to revisit the increased labor costs and hours in May 2022. Again lacking an alternative, Disguise was forced to continue paying increased rates under duress above what was stated in the Agreement and in the March 2022 provisional agreement made over email.

6

33. On November 30, 2022, Disguise informed OSS that it would begin transitioning to a new platform and supplier (the net result of the tactics used by OSS to force price increases on Disguise).

34. Rather than accept this decision gracefully, Raun sent an email to Disguise, on December 12, 2022, threatening that "[a] ship hold has been put in place for all shipments effective immediately", unless certain unreasonable conditions were met, including Disguise paying the alleged inventory fee. OSS now claims that it is now owed over $1.4 million for this inventory fee.

35. Raun added the ship hold would not be released unless Disguise agreed to six extra-contractual conditions. The six extra-contractual conditions included (1) payment of all current accounts receivable; (2) shipment of the GX2 product at current pricing; (3) a written agreement to take all products and inventory; (4) a guarantee from the Carlyle Group Inc. that it guarantees all amounts due; (5) a price increase of 15% to cover overhead, labor hours, and inflationary costs associated with all VX product shipments; and (6) payment of 150% cash on delivery for all future shipments under accounts receivable, credit limit, and working capital limit are brought with "reasonable levels." This was part of a pattern and practice of OSS' unfair business practices. Raun's December 12, 2022 email is incorporated by referenced and affixed as Exhibit 2. OSS acted in bad faith by making these coercive demands, and by placing a hold on shipments until Disguise agreed to accede to these demands.

36. As part of these demands, OSS insisted that Disguise agree to pay OSS an inventory fee of $1,206,344 (now $1,426,557). It reasoned that it was entitled to the fee because, according to OSS, it purchased materials in advance (and contrary to the parties' Agreement) to be prepared for purchase orders that had not yet been submitted by Disguise.

37. OSS' justification for the inventory fee violates the plain language of the Agreement. The Agreement states that "[OSS] will procure, manufacture and ship pursuant to Purchase Orders issued by the Buyer" and that although Disguise will "provide a minimum of a 6 month rolling forecast at the end of each month. Such forecasts shall not be binding on Buyer", as stated in Exhibit C to the Agreement. The Agreement further provides that if ever there was an

instance where a forecast exceeded the amount covered by purchase order, that OSS would always notify Disguise that there was insufficient purchase order coverage *before* OSS purchased materials, upon which Disguise would either reduce the forecast or increase the amount ordered pursuant to purchase orders. There was never a time that OSS was authorized to purchase based on forecast without a purchase order. Pursuant to the clear terms and plain meaning of the Agreement, Disguise has no liability or obligation to pay for supplies or materials ordered by OSS without cover of a purchase order.

38. Disguise did not consent to OSS' extra-contractual conditions. As a result, OSS placed a hold on shipment of products, including both new products and in-warranty repaired or replaced products owed to existing customers.

39. Because OSS refused to return in-warranty repaired products in 2022 and 2023, Disguise incurred not less than $550,000 in damages as a result of Disguise undertaking the duty to repair or replace products requiring in-warranty repairs.

40. OSS' decision to place a hold on shipment of products owed to Disguise further resulted in damages to Disguise in excess of $3 million.

41. Disguise overpaid OSS by at least $600,000 as a result of OSS unilaterally modifying the Agreement by demanding increased payments for labor.

### OSS' ADDITIONAL FAILURES TO SATISFY ITS OBLIGATIONS UNDER THE AGREEMENT

42. On or about January 2023, OSS' quality control over the products it manufactures was shoddy. Disguise received about 130 defective products for in-warranty repairs in 2023. The number of defective in-warranty OSS products returned for repairs has since increased to 142 defective products received by Disguise.

43. Due to problems with the quality of the product manufactured by OSS, Disguise was forced to examine shipments received from OSS prior to providing them to customers. In 2023, Disguise inspected 191 products from OSS. Fifty-two of the inspected products were considered to be defective for various reasons. Put another way, almost one third of the products

8

Disguise inspected from OSS were defective. The high rate of defective product shipped by OSS to Disguise breached the parties' Agreement.

## FIRST CAUSE OF ACTION
## DECLARATORY RELIEF

44. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

45. Disguise never consented to any modification to the Agreement. OSS knew that Disguise would suffer significant financial consequences, if not complete financial ruin, if Disguise did not accede to OSS' demands because Disguise had no viable alternatives to support its manufacturing needs. OSS' demands for sudden price increases jeopardized Disguise's business to such an extent that it had no reasonable alternative except to succumb to the pressure placed on it by OSS. Indeed, OSS' demands were sufficiently coercive to cause any reasonably prudent business person faced with no reasonable alternative except to succumb to such pressure.

46. Specifically, by making threats that would bring a sudden halt to production and shipment of product, Disguise had no reasonable alternative but to agree to OSS' coercive demands as the alternative would have been financial ruin. OSS knew this, and that is why it made these coercive demands. In fact, as a result of the hold placed on shipments in 2023, Disguise experienced severe financial pressure.

47. As a result of this duress, any purported agreement for increased labor rates, or time allocated to production are unenforceable.

48. By making the coercive demands alleged above and knowing that Disguise could not reject those demands without incurring significant financial losses, OSS subjected Disguise to economic duress (or business compulsion). *See Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal.App.3d 1154, 1158 (1984); *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987).

49. The economic pressure deployed by OSS on Disguise deprived Disguise of the ability to contract freely and voluntarily.

50. Disguise seeks a declaration of the parties' rights and obligations under the Agreement, and specifically that any purported modification was caused by duress such that the amounts paid due to that duress should not have been paid, and have never been owed.

51. A judicial declaration is necessary and appropriate at this time, and under the circumstances alleged above so that Disguise may ascertain the parties' rights under the Agreement.

52. As a consequence of OSS' willful conduct, OSS was unjustly enriched by at least $600,000.

## SECOND CAUSE OF ACTION
## DECLARATORY RELIEF

53. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

54. The Agreement required OSS to "procure, manufacture and ship pursuant to Purchase Orders issued by the Buyer" and that although Disguise will provide a minimum of a six month rolling forecast at the end of each month, "such forecasts shall not be binding on Buyer", as stated in Exhibit C of the Agreement.

55. Disguise never consented or directed OSS to procure inventory for the manufacturing of products in a manner conflicting with the Agreement.

56. Throughout the life of the Agreement, Disguise always submitted purchase orders in accordance with the Agreement.

57. OSS' decision to procure an excessive amount of inventory beyond what would be required to manufacture products ordered by Disguise was unilateral and in conflict with the Agreement.

58. Disguise does not owe OSS an inventory fee in the amount of $1,426,557.

## THIRD CAUSE OF ACTION

### UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, ET SEQ.

59. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

60. Beginning approximately November 2022, OSS committed the following act of unfair competition, as defined by Business and Professions Code section 17200 et. seq. ("UCL"), by threatening Disguise. OSS knew that Disguise would suffer significant financial consequences, if not complete financial ruin, if Disguise did not accede to OSS' demands because Disguise had no viable alternatives to support its manufacturing needs. OSS' demands for sudden price increases jeopardized Disguise's business to such an extent that it had no reasonable alternative except to succumb to the pressure placed on it by OSS. These demands and tactics were unfair within the meaning of the UCL. As part of this pattern and practice OSS did intentionally withhold newly manufactured products and in-warranty repaired or replaced products from Disguise in order to frustrate Disguise's ability to do business with third parties. This too was unfair and unlawful within the meaning of the UCL.

61. The acts described above were and are likely to constitute acts that are unfair within the meaning of Business and Professions Code section 17200. OSS knew that it was serving as Disguise's exclusive manufacturer for products that Disguise sells to customers. OSS took advantage of its critical role in Disguise's business operations by making threats, and eventually halting the availability of Disguise's products in order to coerce Disguise into agreeing to extra-contractual conditions.

62. Disguise seeks restitution of the money that OSS unlawfully obtained through these unfair business practices.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

63. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

64. As the distributor of the products produced in connection with the Agreement, Disguise entered into sales agreements with hundreds of third parties for the sale of those products.

65. OSS knew of Disguise's contracts with those third parties. Indeed, the Agreement expressly states that OSS would be Disguise's exclusive manufacturer for products Disguise sold in the Americas, Japan, and Korea.

66. OSS willfully withheld new and in-warranty repaired products owed Disguise under the Agreement with the specific intent of disrupting Disguise's contractual and economic relationships with third parties. Indeed, that is the reason OSS placed a hold on shipments – to place economic pressure on Disguise to accept extortionate price increases. In doing so, OSS intentionally prevented Disguise from fulfilling its sales agreements with third parties.

67. Disguise was not able to fulfill its commitments, and anticipated business with third parties as a direct consequence of OSS willfully withholding delivery of new and in-warranty repaired products.

68. As a consequence of OSS' intentional conduct, Disguise suffered damages in excess of $3 million. On information and belief, Disguise also suffered lost profit damages.

## FIFTH CAUSE OF ACTION
### CONVERSION

69. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

70. Under the Agreement, Disguise owned, or had an immediate right to possess new and in-warranty repaired products that were wrongfully and willfully withheld by OSS.

71. OSS willfully withheld and refused to produce new and in-warranty repaired products owed to Disguise in order to coerce Disguise into capitulating to extra-contractual conditions. OSS' conduct was wrongful and inconsistent with the parties' agreements, as well as Disguise's right to receive shipment of the products.

72. As a direct consequence of OSS' intentional conduct, Disguise suffered damages in excess of $3 million.

## SIXTH CAUSE OF ACTION

## TRESPASS TO CHATTELS

73. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

74. Under the Agreement, Disguise had an immediate right to possess new and in-warranty repaired products that were wrongfully and willfully withheld by Disguise as part of an attempt to extort changes to the parties' agreement.

75. OSS placed a hold on shipment of new and in-warranty repaired products without Disguise's consent. This wrongfully and intentionally interfered with Disguise's possessory interest in the new and in-warranty repaired products that OSS refused to ship.

76. OSS willfully withheld and failed to ship new and in-warranty repaired products owed to Disguise for a substantial amount of time in order to induce Disguise into capitulating to six extra-contractual conditions.

77. As a consequence of OSS' intentional conduct, Disguise suffered damages in excess of $3 million.

## SEVENTH CAUSE OF ACTION

## BREACH OF CONTRACT

78. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

79. OSS and Disguise executed the Agreement on July 1, 2019.

80. Pursuant to Section B(1)(b) of the Agreement, OSS warrantied that when it receives a defective product it produced during the Agreement's the warranty period, it "shall complete such repair or replacement and ship such repaired or replacement Products to Buyer or to Buyer's customer at Supplier's cost (for shipping) within Fifteen Days (15) of Supplier's receipt of such Products at its facility."

81. Disguise performed all of its obligations owed under the Agreement.

82. Without any excuse, OSS failed to provide the products repaired or replaced in accordance within the Agreement's 15-day deadline. OSS intentionally withheld the products, as evidenced by Raun's December 12, 2022 email, because OSS was trying to induce Disguise into agreeing to the six extra-contractual conditions.

83. Section B(2)(a) of the Agreement provides that at least 97% of the products produced by OSS and sent to Disguise must be in conformity with the Agreement's warranty provision referenced in Paragraph 20 of this Complaint. And if in a 90-day period, OSS fails to satisfy the 97% requirement then OSS must provide Disguise with a "corrective action plan" within 10 business days of last nonconforming shipment in the 90-day period.

84. In 2023, Disguise received at least 142 defective products. This amount of defective product constitutes a breach of Section B(2)(a) of the Agreement as less than 97% of the product supplied by OSS were conforming goods, demonstrating shoddy workmanship and poor quality control.

85. Also during 2023, Disguise inspected 191 products produced by OSS in connection with the Agreement. Fifty-two of the 191 products inspected by Disguise were defective and failed to conform with the Agreement's warranty obligations, which meant that about one third of the products inspected were defective and in need of in-warranty repair or replacement. This too constitutes a breach of Section B(2)(a) of the agreement.

86. Accordingly, OSS committed multiple breaches of Section B(2)(a) of the Agreement by producing a high number of non-conforming goods in violation of their promise that at least 97% of their products would be in conformity with the Agreement's warranty provision, and breached the Agreement again by failing to produce and implement a "corrective action plan" to address OSS' shoddy work product.

87. Disguise performed all required conditions under the Agreement.

88. OSS' breach of this contractual term and shoddy work resulted in Disguise incurring damages of at least $550,000.

## EIGHTH CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

89. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

90. OSS and Disguise entered into an Agreement on July 1, 2019.

91. Disguise did all of the significant things that the Agreement required Disguise to do.

92. All the conditions required for OSS to manufacture and sell new products to Disguise were satisfied, including Disguise submitting purchase orders for the products it intended to purchase, and expected to receive.

93. All conditions required for OSS to furnish Disguise with in-warranty repaired or replaced products were satisfied.

94. OSS intentionally threatened, and ultimately withheld new products and in-warranty repaired or replaced products from Disguise in order to coerce Disguise into agreeing to OSS' demands. By doing so, OSS acted in bad faith and denied Disguise the benefit of the bargain under the parties' Agreement.

95. OSS' conduct was unfair, deliberate, and done in bad faith.

96. As a consequence of OSS' intentional conduct, Disguise suffered damages of at least $3 million.

## NINTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

97. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

98. OSS and Disguise executed the Agreement on July 1, 2019.

99. Section B(1)(a) of the Agreement states, in relevant part, that OSS "warrants that it has the right to manufacture and convey the Product and that each Product will be free from all liens and encumbrances (including free from any claim that such Product infringes any third party's

intellectual property rights), defects in material, workmanship and design and will function in accordance with and will conform to the Specifications."

100. In 2023 alone, Disguise received at least 142 defective products evidencing OSS' failure to manufacture and sell products in functioning order and consistent with the Specifications.

101. Also during 2023, Disguise inspected 191 products produced by OSS in connection with the Agreement. Fifty-two of those 191 products inspected by Disguise were defective and failed to conform with the Agreement's Specifications. Stated another way, roughly one third of the products produced by OSS were defective and required repair or replacement.

102. Disguise took reasonable steps to notify OSS of these defects, and OSS received such notice, yet Disguise wound up having to incur costs to repair or replace the products because OSS failed to timely repair or replace the products.

103. OSS failure to produce products to be free of defect as represented was a substantial factor in Disguise incurring damages of at least $550,000.

## TENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

104. Disguise restates and realleges the allegations set forth above and incorporates them by reference as if fully set forth herein.

105. Disguise purchased products identified within the Agreement from OSS.

106. OSS was unquestionably in the business of selling the products identified in the Agreement, and, in fact, held itself out as having special knowledge and skill to manufacture and timely deliver such products.

107. At the time of the sale of those products, many of them (1) were not fit for the ordinary purposes for which the products are used and (2) did not conform to the quality established by the parties' prior dealings or by usage of trade.

108. Disguise took reasonable steps to notify OSS within a reasonable time that the products were defective and did not have the expected quality.

109. OSS failure to produce products fit for their ordinary use resulted in Disguise incurring damages of at least $550,000.

## PRAYER FOR RELIEF

WHEREFORE, Disguise prays for relief as follows:

A. Entry of judgment in favor of Disguise and against OSS on each of Disguise's claims;

B. A declaration that there was no valid modification to the Agreement;

C. A declaration that OSS was unjustly enriched in amount of at least $600,000;

D. A declaration that OSS breached the Agreement;

E. Damages in an amount to be determined at trial, including pre- and post-judgment interest;

F. Punitive damages to be determined at trial;

G. Restitution of all money improperly paid to OSS in connection with its unfair acts pursuant to California Business and Professions Code section 17200, et seq.;

H. A permanent injunction pursuant to California Business and Professions Code section 17203 restraining and enjoining defendant from continuing the acts of unfair competition set forth above;

I. During the pendency of this action, a preliminary injunction issue pursuant to Business and Professions Code section 17203 to enjoin and restrain defendant from the acts of unfair competition set forth above;

J. All costs associated with this case, including attorneys' fees; and

K. Such other and further relief as the Court deems just and proper.

Dated: May 1, 2024    Respectfully submitted,

*/s/ Kaan Ekiner*
Kaan Ekiner (#5607)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046
kekiner@cozen.com

*Of Counsel:*

Barry Golob (*pro hac vice* to be filed)
**COZEN O'CONNOR**
1200 Nineteenth Street, N.W.
Washington, D.C. 20036
(202) 912-4800
bgolob@cozen.com

Nathan Dooley *(pro hac vice* to be filed)
**COZEN O'CONNOR**
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
(213) 892-7933
ndooley@cozen.com

*Attorneys for Plaintiffs Disguise Systems Limited, and Disguise Technologies Limited*